## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 10 2017, 9:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of
Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
S.S. (Minor Child),

and

K.F. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 10, 2017

Court of Appeals Case No.
50A05-1703-JT-658

Appeal from the Marshall Superior Court

The Honorable Curtis D. Palmer, Judge

Trial Court Cause No.
50C01-1605-JT-1

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent K.F. ("Mother") appeals the juvenile court's order terminating her parental rights to S.S. She raises the following restated issue on appeal: whether the Appellee-Petitioner the Indiana Department of Child Services ("DCS") presented sufficient evidence to support termination of her parental rights to S.S. Specifically Mother contends that DCS did not prove by clear and convincing evidence that (1) the conditions that resulted in S.S.'s removal could not be remedied within a reasonable amount of time, (2) continuation of the parent-child relationship posed a threat to the well-being of S.S., and (3) termination was in S.S.'s best interest. Concluding that the evidence is sufficient to support the termination order, we affirm.

# Facts and Procedural History

[2] Mother is the biological parent of S.S., who was born on July 27, 2011.[1] On November 15, 2013, DCS removed S.S. from the parents' care on an emergency basis and placed S.S. in foster care. A Child in Need of Services ("CHINS") petition was filed by DCS on November 19, 2013. DCS's original permanency plan was reunification with Mother. On November 26, 2013, the juvenile court entered an order granting the CHINS petition.

---

[1] The biological father's rights were also terminated, but he does not participate in this appeal.

[3] On March 5, 2015, the juvenile court held a hearing for a periodic case review, and on March 6, 2015, the juvenile court issued an order stating that the permanency plan would continue to be reunification with Mother. On July 2, 2015, a hearing was held on the permanency plan. On July 16, 2015, the juvenile court issued an amended order changing the permanency plan to adoption with a concurrent plan for reunification.

[4] On October 7, 2015, the juvenile court issued an order placing S.S. under the guardianship of his maternal grandmother.[2] The CHINS proceeding remained pending during the guardianship.

[5] On or about January 4, 2016, DCS removed S.S. from his grandmother's care and placed him with a foster family. On January 19, 2016, the trial court issued an order stating that on December 31, 2015, the grandmother said that she could no longer care for S.S. and asked that he be removed from her care. The juvenile court affirmed that S.S. should remain the in foster family's care.

[6] On May 10, 2016, DCS filed a verified petition for involuntary termination of parental rights. After a permanency hearing on July 7, 2016, on July 25, 2016, the juvenile court issued an order stating that the permanency plan would be adoption.

---

[2] The order was issued in cause number 50C01-1508-GU-49.

[7]     On January 31, 2017, a fact-finding hearing was held on DCS's termination petition. At the hearing, DCS's family case manager ("FCM") and the psychologist that worked with Mother during the CHINS proceedings, Dr. Anthony Berardi, testified that termination of parental rights was in the best interest of S.S. Based upon all of the evidence presented, the juvenile court issued an order granting DCS's petition for termination of parental rights on February 23, 2017. In doing so, the juvenile court made the following pertinent specific findings:

> 4.     The child, [S.S.], was removed from the parents' care on an emergency basis on November 15, 2013, and a CHINS Petition was filed thereafter on November 19, 2013.
>
> 5.     The child has now been out of the parents' care for over three years.
>
> ***
>
> 8.     The Marshall County DCS became involved with the family due to a hotline report of November 14, 2013, alleging numerous bruises on the two-year-old child. The child had earlier been diagnosed as Failure-to-Thrive due to insufficient feeding by the mother.
>
> 9.     An investigation the following day showed the child to have bruises on his lower back/spine area, above his right eye, under both left and right eyes, upper rear right thigh, front upper left thigh, right lower inner arm, lower center left leg and left inner elbow.
>
> 10.    Caregivers, mother and maternal grandmother, were either unaware of the bruising or had no explanation for the bruising. The child was diagnosed with global developmental, cognitive, social and speech delays (all of which continue to this day).

11.    The child was adjudicated as a Child in Need of Services on January 16, 2014, and a Dispositional Order was entered on that same date, awarding wardship to the DCS.

12.    The initial permanency plan for the child was reunification. However, the permanency plan was later amended to include concurrent plans of adoption and guardianship.

13.    An initial termination of parental rights petition was filed on August 24, 2015, with regard to both parents (50C01-1508-JT-11). This initial petition was dismissed on October 13, 2015, following the court approval of a guardianship for the child with the maternal grandmother.

14.    Actual placement of the child through the guardianship with the maternal grandmother (50C01-1508-GU-49) lasted less than thirty days until it was terminated by court order (at the request of the grandmother) on January 6, 2016. The CHINS cause remained active through the pendency of the guardianship.

15.    The mother had also resided with the maternal grandmother and the child during the pendency of the guardianship and was the primary care-giver. However, the maternal grandmother was unable to adequately care for the child's special needs, even with the assistance of the mother.

16.    Following the dismissal of the guardianship, the child was returned to the foster home where he had been residing since the initial detention in November of 2013.

17.    The current Petition for Termination of Parental Rights was filed May 10, 2016.

18.    The child has been removed from the parents' care at least six months pursuant to the CHINS dispositional decree.

19.    The child has been removed from the parents' care in excess of fifteen of the most recent twenty-two months pursuant to the CHINS dispositional decree.

20.  The child has special needs due to autism disorder and global developmental delays for which he is receiving physical and occupational therapy services while in foster care.

21.  The child requires a special diet which excludes: dairy, gluten, casein, wheat, corn, bananas, raisins and red dye #40.

22.  A number of services were recommended for the mother which included: a parenting assessment, counseling, visitation with the child, homemaker services, an RSP[3] caseworker and a psychological evaluation.

23.  The counseling, visitation and RSP caseworker services began in 2014 and have continued through the present time.

24.  During the pendency of the CHINS case the mother has demonstrated an unstable living situation in that she has had approximately eight different jobs, and is currently unemployed and selling plasma twice per week for income.

25.  During the pendency of the CHINS case the mother has demonstrated an unstable living situation in that she has moved residences and changed school districts numerous times.

26.  During the pendency of the CHINS case the mother has demonstrated an unstable living situation in that she has moved in with three different men whom she refers to as "fiancés."

27.  All service providers, the DCS family case manager, the foster mother and the CASA all testified that S.S.'s behaviors are best controlled by a stable lifestyle with routine, structure and a highly-regulated diet.

28.  All service providers, the DCS family case manager, the foster mother and the CASA all testified that whatever progress had been made by S.S. when he was first placed in foster care

---

[3] "RSP" stands for Rehabilitation Service Provider.

was lost in the short time he was placed with his grandmother and mother in the guardianship. The court finds that the mother cannot provide the stable lifestyle and routine that S.S.'s special needs require.

29.     The mother's visits had progressed from fully supervised to in-home, partially supervised visits until the mother had an episode of domestic violence with her then fiancé in which she broke his collarbone and her apartment was found to be infested with bedbugs.

30.     Dr. Berardi, the psychologist who performed the psychological evaluation, found the mother to have a below normal intelligence and "a significant personality disorder" which has, and will continue, to cause her to choose poor domestic partners.

31.     The mother is "overwhelmed easily" and prone to outbursts of anger when placed in stressful situations. Visit supervisors reported mother was stressed during supervised visits and would display anger issues.

32.     The mother currently resides with her fiancé, Harry Bobb, with whom she has had domestic violence issues as recently as October of 2016. At that time, she received black eyes from an altercation with him. Mr. Bobb has tested positive for marijuana on a number of occasions and now refuses any further drug tests from the DCS. Mother testified that if she obtained custody of the child, Mr. Bobb would be the caretaker for the child while she was at work. (Mr. Bobb is home full-time as he receives disability income.)

33.     Dr. Berardi also opined that the mother does not function well in stressful situations and that financial pressures, her numerous job changes, residence changes and romantic partner changes created stress for her. He also noted that caring for a special needs child is a stress creator. He advised the DCS that reunification with the mother should not be pursued.

34. Mother was provided a Bowen Center RSP who worked within the home on financial budgeting and other stress management issues. This service was not successful as the mother ordered the RSP caseworker not to return to her home or she would call the police and have the RSP caseworker arrested for trespassing.

35. All service providers, the DCS family case manager, the foster mother and the CASA all testified the child needs continuous "line of sight" supervision in order to remain safe. In the past, he has exhibited self-harming behaviors of eating non-food items that will fit in his mouth, banging his head on solid objects and picking his nose with the intent to cause bleeding. He also "bolts" from caregivers unexpectedly and can run into roads or out of the house if not watched carefully. A harness is used on him at times when out in public. A special bed is required that keeps him fully contained at night so he cannot get out and hurt himself. He will be six years old this summer and is not potty trained. He has only recently begun to use words, but cannot form even simple sentences.

36. During physical and occupational therapy, he has tried to escape the therapy facility. The therapists noted that the child's behaviors in therapy sessions were much more controlled when he is subject to routine structure and a regulated diet. On one occasion, when the child was brought to therapy by the mother (during the maternal grandmother guardianship period) it was obvious that he was out of his routine and/or off of his diet as his behaviors were out of control. He head-butted one his therapists, breaking her nose.

37. The foster mother, who has had the child in her home for the past three years, has considered adopting him. However, she has four older children of her own who help provide supervision for the child and when those children are grown she is unsure she can provide the child the constant supervision he needs without their assistance.

38.     Despite three years of instruction through the visitation supervisors, DCS personnel, counseling and therapy professionals, the mother (although she has made some progress) has been unable to demonstrate the ability to understand or ability to implement the tools necessary to take care of the child's special needs.

39.     The CASA volunteer, Ms. Kinney, believes the mother is incapable of prioritizing the child's special needs over her other life issues and that termination of parental rights is in the child's best interests.

40.     The mother has concerns that someday the child will be bigger and stronger than her and she will not be able to physically control him.

41.     The court finds that the mother is (and will continue to be) unable to meet the special needs of the child caused by his autism spectrum disorder and global developmental delays.

42.     The court further finds that there is a reasonable probability that the conditions which resulted in the removal from the parents' home and placement outside the home will not be remedied because the mother's low intellectual functioning and personality disorder result in her inability to meet the child's special needs.

43.     The court further finds that termination of the parent-child relationship is in the best interests of the child and there is a reasonable probability that the continuation of the parent-child relationship threatens the well-being of the child.

Appellant's App. Vol. II, pp. 11-14.

[8]     S.S. has been placed in a stable home with a foster family. He has been living with the foster mother for over three years, and she testified that she would be able to continue caring for him.

# Discussion and Decision

[9]     This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Thus, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* We will only set aside the court judgment terminating a parent-child relationship if it is clearly erroneous. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008).

[10]    The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 145 (Ind. 2005). Furthermore, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, parental rights are not absolute and the law allows for the termination of such rights when a parent is unable or unwilling to meet her responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans denied.* The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id.* The juvenile court may terminate the parental rights if the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child has suffered from irreversible harm. *Id.*

Before an involuntary termination of parental rights may occur, DCS is required to prove by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>>
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) termination is in the best interests of the child; and
>
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in a termination case is one of "clear and convincing evidence." *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009).

## I.   Conditions Resulting in Removal Not Likely to Be Remedied

[12]   "We begin by emphasizing that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006). "When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 2002).

[13]   When determining whether there is a reasonable probability that a parent will remedy the conditions resulting in their child's removal from the home, a trial court engages in a two-step inquiry. First the trial court "must ascertain what conditions led to their placement and retention in foster care." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). Second, the trial court must determine "whether there is a reasonable probability that those conditions will not be remedied." *Id.* The statute does not simply focus on the initial reason or reasons for removal, "but also those bases resulting in continued placement

outside the home." *In re A.I. v. Vanderburgh Cnty. OFC*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005).

[14] Mother argues that the evidence does not support the finding that there is a reasonable probability that the conditions that resulted in S.S.'s removal will not be remedied because the initial reason S.S. was removed was the bruising found on his body. Mother further argues that the trial court focused on Mother's inability to care for S.S., which was not a factor in his original removal. Mother, however, is misreading the statute. Under Indiana Code section 31-35-2-4(b)(2)(B)(i), DCS must show a "reasonable probability that the conditions that resulted in the child's removal *or* the reasons for placement outside of the home of the parents will not be remedied." (emphasis added). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 934 N.E.2d at 806. As DCS and the juvenile court noted, S.S. continued to remain outside of his Mother's care due to her inability to properly supervise and care for him.

[15] The juvenile court made numerous thoughtful findings regarding Mother's instability, lack of consistent housing and employment, unstable and sometimes violent relationships with her three different fiancés, psychological issues, inability to manage stress, drug use, and inability to meet S.S.'s special needs notwithstanding the myriad of services that were designated to address her issues throughout the underlying CHINS and instant termination proceedings.

Specifically, the record reveals that during the underlying CHINS proceeding Mother has had at least eight jobs, has moved numerous times, has had three different live-in and unemployed fiancés, and is incapable of understanding and addressing S.S.'s special needs and dietary restrictions. Despite the extensive services provided to Mother over the course of several years, the juvenile court determined, at the time of the termination hearing, that Mother was incapable of providing S.S. with a safe and stable environment nor is she capable of meeting S.S.'s special needs caused by his autism spectrum disorder, global development delays, and special dietary needs. Based upon the ample evidence that Mother is "unable to demonstrate the ability to understand and the ability to implement the tools necessary to take care of [S.S.'s] special needs," and her inability to maintain stable employment and housing, we conclude that Mother has not sustained her burden to show that the juvenile court's determination in this regard was clearly erroneous. Appellant's App. Vol. II, p. 14.

## II. Continuation of the Parent-Child Relationship Posed a Threat to the Child's Well-being

Next we address Mother's claim that DCS failed to show by clear and convincing evidence that the continuation of the parent-child relationship would be detrimental to S.S. Under Indiana Code section 31-35-2-4(b)(2)(B), DCS need only prove that "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the home of the parents will not be remedied," that "[t]here is a

reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child," *or* that the child has been adjudicated as CHINS on two separate occasions. As discussed above, DCS presented ample evidence for the juvenile court to conclude that there was not a reasonable probability that the reasons for continued placement outside of the parent's home would not be remedied. Because Indiana Code section 31-35-2-4(b)(2(B) is written in the disjunctive, and in light of our conclusion relating to the probability that the conditions leading to continued placement outside of the parent's home would not be remedied, we need not consider Mother's claim as to whether the evidence is sufficient to prove that the parent-child relationship posed a threat to the S.S.'s well-being.

# III. The Child's Best Interest

[17] Finally, we address Mother's claim that DCS failed to prove that termination of her parental rights was in S.S.'s best interest. When reviewing such claims, we are mindful of the fact that the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the circumstances. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, this court must subordinate the interest of the parent of the child involved. *Id.*

[18] In addressing whether continuation of the parent-child relationship is in S.S.'s best interest, we note that the DCS case manager and the psychologist, Dr. Berardi, testified that termination was in S.S.'s best interest. Such testimony is

sufficient to support the juvenile court's conclusion in this regard. *See In re A.B.*, 887 N.E.2d 158, 170 (Ind. Ct. App. 2008). However, additional evidence further supports the juvenile court's conclusion. S.S. has autism spectrum disorder and global developmental delays. Consequently, S.S. requires a special diet, a calm environment, and a routine schedule. If he does not receive these things, S.S. is likely to have tantrums during which he will throw himself to the ground, throw things, head-butt objects or people until he bleeds, or pick his nose until he bleeds.

[19] Furthermore, during the CHINS proceedings Mother lived in at least eight different residences in multiple school districts, held at least eight different jobs, and had three unemployed and live-in fiancés. Mother also has a personality disorder that causes her to enter into volatile romantic relationships. Mother has broken the collarbone of one of her ex-fiancés, and her current fiancé has hit her on at least one occasion. Despite the violence, Mother has no plans to end the relationship. In fact, Mother expects the current fiancé to help her care for S.S. This is clear evidence that Mother is likely to continue engaging in a very tumultuous and violent lifestyle. It is likely that exposing S.S. to such a negative environment would cause him to engage in behavior that is harmful to himself and others.

[20] The testimony from service providers established that Mother has not "shown that she understands, and can meet his needs, based on his diagnosis and his behavior and the special requirements that he has." Tr. pp. 52-53. Dr. Berardi opined that Mother is "[p]reoccupied with her emotional neediness" and she

"clearly put[s] her own needs before her son's needs for a stable mother and home life." Ex. p. 14. Dr. Berardi further opined that Mother's psychological issues make it unlikely that she will reach a level of stability that would allow her to care for her son. Consequently, Dr. Berardi recommended that DCS seek alternative permanency plans for S.S.

[21] In sum, Mother's history of instability, and psychological issues, as well as her lack of understanding of how to meet S.S.'s special needs, support the juvenile court's decision to terminate her parental rights. We decline her invitation to reweigh and reassess the evidence related to the challenged findings. We therefore conclude that the juvenile court did not clearly err in terminating Mother's parental rights with S.S.

[22] We affirm the judgment of the juvenile court.

May, J., and Barnes, J., concur.